on behalf of the appellant, Ronald Denton. I'd like to start by focusing the Court's attention on the claim that there was error when the District Court declined or failed to give a unanimity instruction. And the basis for the argument here is tied intricately to the facts that were charged and that are at issue. And I know the Court's aware of it, but to reiterate, we're talking about a two-year time period during which my client is having regular counseling sessions with Dr. Gelbart, during which time he's making a variety of statements which, in the government's eyes after the facts, many of which constituted threats. But Dr. Gelbart makes no report during that time pursuant to terror assault. He's not making any conclusions that they're actually threats. He is, however, relaying those statements to Chevron. And so it's clear that this information that's passing from my client through his psychotherapist to Chevron and ultimately to Chevron Civil Counsel for a period of two years wasn't sufficiently clear at any given point in time to interrupt those events. Exactly which of the statements, and there's some approximately 80-plus during that period of time that the government contended in its bill of particulars would have satisfied the statutes at issue here to constitute the violations, exactly which particular set of circumstances, which particular statement constituted a particular threat, there's no way to really know. Mr. Denton has stated very clearly in his opening brief, we're not relying on or urging this Court to think in any way that there's an insufficiency of the evidence. There's clearly a sufficient amount of evidence for reasonable jury members to conclude that threats were uttered. The question is, and we respectfully submit, the error occurred when the jury was left without any guidance or without any specific direction telling it that all 12 jury members had to be in agreement to find a particular statement to have actually constituted a threat, such as to constitute in turn a violation of each of the two statutes that were at issue. Now there's a lot of discussion in the briefing about whether or not this issue was preserved and it is clear, as Mr. Denton acknowledges in his briefing, that there was not a specific request for the unanimity instruction. But the issue had been put into sharp focus during the pretrial litigation that was conducted in this case by, if I may respectfully submit, very effective defense counsel before the District Court. They brought appropriate motions, including a motion for a bill of particulars, precisely because of the confusion surrounding the length of the events that were at issue and the fact there were numerous statements and they couldn't quite be sure what exactly was at issue. And the District Court, in a very detailed and thoughtful written order, explained that although it was ordering a bill of particulars, this particular source of potential confusion could be cured by the giving of a unanimity instruction. I read this record and I look at it and I think what's in front of the court will make clear that defense counsel were very diligent. Now there's no way to know whether in fact they just simply dropped the ball and when the time came for a request or whether they simply, in a reasonable reliance on the District Court's previous written order, considered that the District Court was already aware of the point and for whatever reason it was just left there after no unanimity instruction was given. But so just that's... The counsel knew what instructions the court was going to give, at least at the moment they were being given, but really knew sometime before then, too. And you can look and see there is not something there. So if they counted on the previous order kicking in at that point in time, they should have realized it didn't and they needed to do something. Your Honor, that's correct. It would have been another point. My review of this case suggested, yeah, they're pretty thorough. Could it be that part of the problem here is that we're dealing with a series of events and a series of events, statements being made to Dr. Gelbart, I believe his name is. Yes, Your Honor. And a desire on the part of defendant to be sure that at least something that he's telling Dr. Gelbart is also being told to Chevron. And it seemed to me that there was no dispute really about the threats being articulated to Dr. Gelbart, maybe some disagreement as to exactly what it was that was said. But the fact of the series of threats is pretty well there. The issue seems to turn more on intent. What was he intending to have communicated on to Chevron? And there was evidence both from Dr. Gelbart and from, I forgot the name of the person at Chevron responsible for their employee assistance program, but. Steve Blank, I believe, Your Honor. He testified that, yes, Mr. Denton wanted to make sure that he was getting it from Dr. Gelbart and further that he wasn't just holding it himself, but he was passing it on to the higher ups at Chevron. What's sort of maddening looking at it after the fact is that what this was isn't all that well defined. But if you recognize that it's a series of conversations with Dr. Gelbart, so it's not really a matter of saying, you know, on June 17th, I said I was going to do X. And on July 15th, I said Y. It's not so much that Mr. Denton is accused of trying to communicate that X threat in particular to Chevron, but the collection of things that were being told to Dr. Gelbart, because Mr. Denton, according to the evidence and the jury could fairly find, was trying to communicate to Chevron they'd better take care of him in some fashion. So, you know, put that way, I've struggled with this issue back and forth, but put that way, it begins to sound to me a little bit like what the statement of the offense is the threat, or the intended threat. And for Richardson, it didn't matter whether it was going to be with a knife or a gun, as long as the jurors all agreed on the threat. How could that be translated to this situation? It doesn't matter whether it was a statement on June 15th or July 7th. It was the combination of things and the intent to have it communicated to Chevron that makes it a criminal offense. I think the situation Your Honor posits is an accurate and a reasonable one. But one of the particularly troublesome facts here is that Dr. Gelbart specifically told Mr. Langer, and this would have been in October of 2000, that in fact Mr. Denton's statements were not to be construed as threats. So there was a lot of vacillation here. Although the court indicates a situation where one day perhaps he said one thing and then a month later he said something else, if those things are consistent, then perhaps the individual instance isn't as particularly critical. But Your Honor, here we do have in this particular span of time, these two years, wide fluctuations on behalf of my client. And that's what makes the unanimity, the specific unanimity instruction so key. He is clearly fluctuating. He goes on vacation. He comes back. He's calm. He's relaxed. He's not indicating any anger or the level of frustration that he had previously. And he says things that detract or that remove from the government, the force from the government's arguments. And then on the other hand, he blows up when things go awry or when his civil litigation isn't proceeding on the pace he thinks it should go. How does the court propose to reconcile that statement from the attending psychotherapist, Dr. Gelbart, that in October of 2000, these statements aren't threats? Now clearly Dr. Gelbart has a different opinion at different points in time. You do have a man who's seething with anger. He's clearly got, he has a very... Not only turns against the company, but fellow employees who he feels have done something offensive, whether they have or not. That's his take on it. That is correct, Your Honor. That's a concern because we all know there can be explosions by these people after a Except that all three of the experts who submitted reports to the district court in this matter concluded that he was not a high risk for actual perpetration of acts of violence. The two defense experts concluded that he was a low risk. And the government's expert concluded that at best he was a moderate risk of actually doing something. Now that's not a non-risk. I agree. Your Honor is correct. Mr. Denton has a serious issue. He has a serious problem with anger management. It cost him his long-term job with Chevron. He was engaged in the psychotherapy counseling precisely as a condition to receive even the disability benefits that he was receiving during these two years. So there's a problem here. And I agree that it's correct and appropriate for people in positions of responsibility such as Mr. Lange to have been attuned to the situation and to have been concerned about it. But the minute we go from that civil context where Mr. Denton was, dismiss the civil case and in comes the FBI and Mr. Denton is arrested and placed in a criminal context, I think the analysis changes completely. And we come back to the question of whether Mr. Denton has been lawfully convicted of these particular offenses. And I don't submit to the court that without a specific unanimity instruction here, there's no way to know what those jurors found, whether all 12 of them were ever in agreement about any specific statement. And there's an additional problem here, quite serious of course, which is the testimony that Dr. Gelbarg is allowed to give, testifying as to the specific and final fact, which is that Mr. Denton made threats of violence. Well, isn't he basically a reporter? He's not really called as an expert. He's not qualified as an expert. He's merely somebody who took down a statement, which I guess anybody could do that, and then just transmit it. And his patient said it's okay to tell them. But that reporter, Your Honor, was editorializing along the way. He was editorializing along the way. And that's the part that was offensive, and that's what Mr. Denton tried to have the district court preclude. It's not the reporting of the specific statements where we assign error. It is the fact that then Dr. Gelbarg says, and this was a threat, I considered this to be a threatening statement. He says it in his testimony. He's asked questions, and they're cited in the opening, and their passage is cited in the briefing. He also has it in his notes, which also were admitted over defense objection, wherein he states supposedly in parentheses or quotation marks, rather, what Mr. Denton is saying, and then follows it with his own assessment that it's a threat. So you do actually have him going beyond just the factual recital of what was said in his presence. We don't have any quarrel with his reciting what was heard, what was actually told to him, what he observed from Mr. Denton. It's the conclusion that he draws from that, which is that it's a threat. He's just a listener. He's the only person that can indicate. You indicated it was an October, not concern, not a threat. Well, that's important to communicate because he's heard things, and he can put it in context, and he can make that evaluation. But even separate apart from his professional qualifications, I've heard people articulate lots of threats, and by listening to them, I can tell whether they're serious or not. And as a witness, I would ordinarily be allowed to testify in order to communicate as best I could as a witness by tone of voice and demeanor and gestures and whatnot, whether I thought the threat was serious or not. I mean, isn't that something a layman can testify to? Your Honor, if your state of mind were an issue for the particular offense or particular events there, yes, that would be relevant. Even as an observer. Couldn't an observer use that method of communication to express what it was that the observer witnessed? I'd respectfully submit no, Your Honor, particularly not on these facts where the jury is abundantly clear from the very beginning that this is a psychotherapist who's trained in precisely this area, that this takes this beyond just simply ordinary witness observations and puts it square into an expert opinion, which is prohibited under the rules of evidence. That's what he was not supposed to have been allowed to do, should not have been allowed to do, and that's when the error occurred. There's no way on these particular facts to divorce this witness from his professional credentials when he starts telling the jury that Mr. Denton, in fact, made a threat. That, for all realistic purposes, is the end of all inquiries as far as the jurors could have been concerned, and that's what makes it so prejudicial. And that's an additional reason why admission of Exhibit 24,  except it also in many ways supplements and goes on with additional statements that Dr. Gelbart didn't manage to get in through his testimony because he protested a lack of any present recollection during his testimony for these two years' events. That notebook of his sessions with Mr. Denton is extensive and highly damaging and contained numerous prejudicial statements, his assessments, again, that they were threats, but also a number of references to Mr. Denton's statements about his ability to carry through on his threats, his purchase of firearms, that he owned three firearms, his acquisition of books about bombing and so forth, all of which are highly prejudicial and damaging items that should have been grave concern to human resources and to Chevron, but none of which were relevant to the offenses that were charged in the indictment. But wasn't your client seeing other psychiatrists and other people who were in that field? My client saw a number of different individuals, Your Honor, at various points. At the same time, he was seeing Gelbart, wasn't he, seeing them? He was referred through many different doctors for different assessments. And did they testify as to him? My recollection is, no, that Dr. Gelbart was the only doctor who testified. No, but I'm saying he could have called those people if they would have been helpful to him, couldn't he? Otherwise, you see a doctor, you're not bound by what one person's opinion is. Many people go to see another doctor to either confirm that opinion or to get somebody who opposes it. Well, my client was bound to see Dr. Gelbart in order to receive his disability from Chevron. No, I understand. Perhaps I've misunderstood the court. But he had other people that were seeing him who were psychiatrists or people in that field. Each saw him for a specific reason, that is, for a particular type of assessment, whether it was for disability benefits. And in turn, ultimately he was referred to Gelbart, who remained the treating psychotherapist, until Dr. Park Dietz came in and, without ever seeing Mr. Denton, opined that he was a dangerous individual and that criminal intervention was justified. I'm sorry, Your Honor, I have to apologize because I have the sense perhaps I haven't followed the court or maybe I haven't answered the court's question. I'm sorry? No, you answered the question. Okay. And unless the court has any further questions right now, I prefer to reserve the time remaining. Thank you, sir. Thank you. Good morning, Your Honors. May it please the Court. Rod Castro, civil for the United States. I guess what I'll do is that I'll focus on the issues that defense counsel focused on. It appears that the duplicity issue has gone by the wayside. The government argued it, obviously, in its briefs and will submit on its briefs with respect to that issue. On the unanimity issue, the first question that must be asked by the court is whether or not there was a genuine possibility of juror confusion. And in this case, there are none of those factors. First of all, the jury never submitted a note to the court, never asked for clarification as to what it was supposed to find. Second, the case was not a complex case. This was a straightforward making a series of threats during a specified period of time with the purpose of extorting Chevron on count one. On count two is he threatened to use a weapon of mass destruction. And that threat would have affected interstate commerce. Very straightforward case, very straightforward legal issues and straightforward evidence. There certainly was no, and the defense has made no argument with respect to there being a discrepancy between the indictment and the evidence presented in the case. And there does not appear to be any other genuine issue with respect to any kind of jury confusion. The, as Judge Clifton noted, this was a particular case, specific case, maybe a unique case in the sense that this was a continuing offense. It was a scheme. The scheme that the defendant had was to try to extort money from Chevron because he was dissatisfied with the way he was treated there. As part of that scheme, he made a series of statements that Chevron, as well as Dr. Gail Barth, considered to be threats, and obviously the jury considered to be threats, or at least threats of violence. And that is an important issue. The element for count one was did the defendant make threats of violence against property, the property of the individual? Did he make threats of violence against the employees of Chevron? Not did the defendant make a specific threat. And for the purpose, did he make the threats of violence for the purpose of, in furtherance of, a plan to extort money? And the jury was instructed on that. The jury was also instructed on, with respect to its requirement to find unanimously that the defendant was guilty with respect to each count. So there was one victim, one author of the threats, the defendant, one listener, essentially, Dr. Gail Barth, as well as Mr. Langer from EAP. He, although didn't hear any specific threats, he was called by the defendant to find out whether or not he was receiving the threats from Dr. Gail Barth. And all of these were for purposes, for one purpose. Now, the jury was also, with respect to count two, was told the elements of that offense. And the elements of that offense are very clear, that the defendant not only threatened to use a weapon of mass destruction, the weapon of mass destruction was threatened to be used against Chevron. The results of such use would have affected interstate commerce. In addition to that, the jury was instructed on what a threat was. What it should consider in determining whether or not threats were made. And in that instruction, the court said, would a reasonable person foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault. And would the alleged, I'm sorry, the alleged threat, again in the singular, should be considered in light of its entire factual context, including the surrounding events and the reactions of the listeners. So even if we don't consider this to be a unique case in the sense that these were a series of threats and that the threatening violence was part of this entire scheme, and we require the jury to have found a specific threat at a specific time, the instructions were clear that that was what the jury could find and should find in terms of. Well, they're clear that that's what the jury had defined. I mean, it's really, the jury could agree there was a particular, the June 15th threat. I'm making up a date, but is it so clear that the jury had to settle upon a specific overt articulated threat? I don't think so. It's part of my, as an alternative argument in the sense that I agree with the court that this was a unique sense and that this was a series of, it was a continuing offense in essence, and that these, all of these statements were for one purpose, to extort money from the jury. Each statement constituted in the overall scheme a threat to commit violence against Chevron and or its employees. Now, in the alternative, the court thinks, believes that that is not an accurate statement of the law or is an inaccurate theory, then we can certainly rely on what was in fact instructed to the jury, what the jury was instructed with, and that was in terms of the threat, and that it was a singular threat. And that's why I suggested that. Now... Let me pause a moment, and I'll just raise the question the way it comes to mind because of a defendant's argument. I take it the specific unanimity instruction or the concept or the possibility of giving that simply did not rise to the surface at the time the instructions were formulated and ultimately given. Even though there had been a reference earlier in the case to the, what I'll just call the desirability of giving a more specific unanimity instruction. Do you have a sense as to why it was, did it simply not occur to anybody or was there any calculated decision that as the case played out it wasn't necessary or appropriate? With respect to the government, I'm trying to recall what our thought process was at that time. To be honest, Your Honor, I do not remember specifically. I certainly do know that the defense at no point in time requested such a unanimity, a specific unanimity instruction. And with respect to what the district court talked about earlier in its order with respect to the duplicity issue, in fact it was in that order that the court issued this language, it wasn't so much the court itself was saying at some future time I think it might be a good idea to have a unanimity, a specific unanimity instruction. It was only referencing the case Robbins, which is a Fifth Circuit case, which I apologize, we cite it as a Ninth Circuit case in our briefs. But Robbins, the court was in essence just quoting what Robbins was saying were the factors. And it was the district court at no point that I recall in its order saying I believe that in the future we may need a specific unanimity instruction. So I think that that is a, I don't want to say mischaracterization or inaccurate, but that the court did not specifically say I believe or I think that in the future we may need a specific unanimity instruction. Now with respect to Dr. Gelbart's statements during trial, as the court knows, the reaction of the listener is relevant to a case like a threats type case. In this case, Dr. Gelbart was the only person that actually received those statements from the defense. And was the only person in fact that could communicate to Chevron the seriousness of these threats because what's important about this case, again, this isn't just a threats case. This is a threats case that is coupled with a demand for money. And Dr. Gelbart had to let Chevron know, as the defendant wanted him to let Chevron know, had to let Chevron know that there was  He had to let Chevron know, look, he is serious about these statements. He is serious about these threats. And if you guys don't do something about it, he's going to commit the violent acts that he claims he's going to commit. So the doctor's conclusions as to the seriousness of the threats, as to the potential result that could occur if Chevron did not pay, those were critical to the defendant's own wishes. And they were part of the case. The doctor did not, Dr. Gelbart did not look at a series of reports where he had no personal knowledge of anything and then come and testify at trial before a jury and give opinions as to whether or not this statement is a threat or this statement is a threat. Or I consider in my expert opinion that this statement constitutes a threat. Dr. Gelbart was merely parodying, in a sense, what his notes said. And what his, in fact, he even testified at trial that he had no independent recollection of the events other than by looking at his notes. So the notes that he had were, in essence, what his perceptions were at the time that the defendant was making these statements. And what it was that he was communicating to Chevron at the request of the defendant. Moreover, there was no unfair prejudice here because the court specifically instructed the jury to look at the notes. The court instructed the jury not once, not twice, but three times with respect to how the jury should consider Dr. Gelbart's statements and conclusions. At Government's Excerpt of Record, page 127, page 130, the court specifically told the jury that they should not consider Dr. Gelbart's statements for the truth of the matter, his conclusions for the truth of the matter, but only how he interpreted these statements to be, what his mental state was at the time. So the jury understood that they weren't supposed to listen to Dr. Gelbart's conclusions and consider that to be a true statement. In other words, they knew who Dr. Gelbart was. I'm sorry? They knew who he was. Yes. And his background. Correct. So he had a sort of aura about him of being a professional person telling you what he had heard from someone. Well, I think whether or not he had an aura, that's hard to say, Your Honor. He was, he testified that he was his psychotherapist. He testified about some of his background, some of his education. Is it possible to introduce his testimony as a layman as opposed to that of a trained person who was performing the function of a psychotherapist? Could a jury distinguish between those two? I think so. In this instance, they could have, Your Honor. The way this trial proceeded, it was very obvious that Dr. Gelbart was a layman. I believe to the jury that Dr. Gelbart was testifying with respect to what he had in his notes, not with respect to a new, newly created opinion. No, nothing newly created. But are you saying by that he was testifying as to his professional opinion? I believe he was testifying with respect to the conclusions that he was making about the different defendant's statements and the seriousness of those statements as they related to the defendant's demands for money and how he would communicate those demands to Chevron. And also professionally, yes, I do believe he did testify that as part of his therapy, he wanted to make sure whether or not the therapy was proceeding as he would wish it would proceed, which is a leveling down of this anger and this sense of, you know, wanting to commit violence against Chevron. So it was a mixture of both. It was a combination of, yes, at times I felt that his, and I believe that his threats were very serious, and I was disappointed at that because I wished that the therapy was going better. And at other times it was a conclusion that these are serious because I need to let Chevron know that these are serious threats and that he intends to do what he claims he intends to do unless you pay him money. So it was a combination of both. And I think the jury could adequately balance those two out. Well, the question was whether it matters or not is something else. But the question, you seem to be suggesting or stating in your brief that this was, he was not being presented as an expert, but it was like lay testimony of somebody who observed something. My question is, is that really realistic to say, or is it accurate? Is it realistic to say that when Dr. Gilbert testified as to what his impressions were, that they were simply the impressions of any layman observing an automobile accident? Or isn't his testimony necessarily that of an expert as a psychotherapist, how he viewed the statements he was hearing in that capacity? Well, his conclusions and statements were definitely made in the context of his being a therapist. There's no dispute about that, in that obviously as a therapist he had a Ph.D. and he was a doctor. But I would analogize it to, and the Court gave the example of a car accident, I would analogize it as to if a doctor is driving down a street and sees a car accident and he or she comes out of the car to help the people that are hurt in the accident and observes at that particular moment in time that there is bleeding or that, you know, makes conclusions. So he's an eyewitness. In the other case, Gilbert is a person who has the background and who has engaged in this business for over 20 years. So his statements would have a greater impact than if it was myself or anyone else hearing that same thing without that background. But in this case, Dr. Gilbert was also an eyewitness. In fact, he was the only eyewitness in this case. And his perceptions of these statements were, you know, he was the only eyewitness. His perceptions were the only evidence, really, of the seriousness of these statements. Certainly, Mr. Langer could testify to receiving calls from the defendant saying, my message is being passed on. But the only person that could testify to the defendant's demeanor, to how he felt the defendant was, whether or not he was serious about these threats and about these demands, Dr. Gilbert was the only person. Now, yes, he was a psychotherapist, and yes, he did have a Ph.D., but I don't think that that prevents him from testifying as an eyewitness, merely as an eyewitness, just like a doctor seeing an accident wouldn't prevent him. Well, he can obviously testify to the things he observed, and he can describe them. I'm not quite sure we focused on what part of what he said is the defendant objects to, and I suppose it would be conclusions. In the, where he says, yes, it's one thing to say he said it in a menacing manner. It's another thing to say he appeared angry. It's the final thing to say, this constituted a threat. And I assume that that's what the defendant is objecting to, not his report of what he observed. I may be wrong here, but I do not believe that Dr. Gilbert ever opined that this was a threat. He used the word threat. In other words, he would say, he testified to, I communicated these threats to Mr. Langer or to Chevron. His conclusions were always more in the sense of, I consider these statements, or I consider these threats to be serious, and you should take these statements seriously, because if you don't, and you don't pay him the money, he's going to act out on them. And this is what he wants me to tell you. So in that sense, he never opined, this is a threat, and jury, you should consider my statement as an opinion that this constitutes a threat. It was different from that. But apart from that, even if he had, in this case, the district court was very explicit, and at GER 184, gave a limiting instruction to the jury and said that his opinions and impressions should not be given extra weight, and the ultimate decision on whether the statements are threats is yours, you the jury. And she gave that, the court, the district court gave that instruction in the middle of Dr. Gilbert's testimony. So it was fresh in the jury's mind, and the court made clear to them that they are the ultimate finders of fact in terms of whether or not this constitutes a threat. You see that I only have two and a half minutes left, and I wanted to address the cross-appeal. In this case, there was simply no evidence that the defendant accepted responsibility, that he had genuine remorse for what he had done. Now, there is some indication in the defendant's briefings that he simply went to trial, not to contest guilt, but to contest, it was a legal question. But that's inaccurate. In fact, the defendant specifically argued and presented a case where he was saying, one, I didn't make these statements. I didn't intend to connect the statements to demands for money. That's the factual element of furtherance of a plan to extort money. I never connected those statements to demands for money. Dr. Gilbert misinterpreted my statements. And I didn't intend to threaten. Those are factual questions. It's different from a simply legal question of where he's arguing that the law does not apply to the facet issue. He was contesting his guilt. And he went to trial, he contested guilt, and then at time of sentencing, he presented an 11-page letter to the court where he adamantly defended his innocence. Those were his words, an 11-page letter where he blamed everyone but himself for his predicament. And for the court to have found that the letter was evidence of his acceptance of responsibility is error, as well as the district court's finding that he rehabilitated himself or engaged in post-offense rehabilitation by taking the same type of medication that he was taking before. In fact, no one, not even the probation office nor the defense, argued for an acceptance of responsibility on those grounds. And on the diminished capacity issue, again, putting aside, and I'll submit the initial issue, which is that the offenses involve serious threats of violence. But even assuming that this court finds that the underlying facts and circumstances of the defendant's offenses did not constitute serious threats of violence. Which they did. But even if the court finds that they didn't, and reaches the issue of actual diminished capacity, there was no evidence before the court to indicate that the defendant had a significantly impaired ability to exercise the power of reason. The district court found that simply on her own belief that someone threatening to extort a Fortune 500 company must not have, for whatever reason, the power of reason. For whatever reason, cannot be rational. But yet, the evidence was presented to the district court that the demands that he made were tied to what his lawyer told him. His civil lawyer told him the civil suit was worth. And in fact, the district court dismissed entirely the evidence that the defendant presented with respect to his impaired ability. And said that there is no way I will find that his upbringing in East Texas, or his work at Chevron, prompted him to do so. Or allowed him to make the threats that he made, and to conduct himself in the way that he did. And with that, and with the remaining 55 seconds, I will submit and leave the remainder of my time for rebuttal, if necessary. Thank you, Your Honor. May it please the Court, since there's not anything that the government mentions with regard to the Cross-Appeal issues that the district court didn't have in front of it, and didn't indicate directly on the record that it reviewed. I'll leave those issues unless the Court has questions pertaining to them. To come to the question, though, of what precisely are the areas to which the defendant objects with regard to Dr. Gelbart's testimony, it's addressed starting in the AOB at page 42. And one reason I could expect perhaps the Court may be unclear about it is because it's not listed exhaustively, because it's so pervasive throughout all of Dr. Gelbart's testimony. This is the reason there was so consistently renewed objections, and continuing objections to the Cross-Appeal. There was a motion to strike his entire testimony. He testified repeatedly as to his conclusory view that the defendant had made threats. There was a motion for mistrial. There was a motion to strike his entire testimony. The area was very thoroughly and soundly found offensive by defense counsel. And so it's not one particular passage, but there is, for example, as an illustrated passage at page 44 of the AOB, where the jury, it's noted where the jury heard Dr. Gelbart testify as to how he told the Chevron committee that the defendant had made threats. That the defendant was, quote, capable of doing the things he's doing, in my opinion. I mean the things that he's threatening, unquote. That's just a representative, but it's a sample of the types of statements. Dr. Gelbart's notes pervasively also contain the term threat with regards to Mr. Denton's statements. And there is no question but that as a percipient witness, Dr. Gelbart was able to, and indeed because he was called to the stand to do so, compelled to answer questions about what Mr. Denton told him. But that's distinct from the issue that the defendant puts in front of the court. Dr. Gelbart's view that the defendant was capable of carrying these things out is interesting given the fact that it's actually a direct odds with what the three experts at sentencing opined about Mr. Denton. The two defense experts who said he was a low risk of carrying any of this out, and the government's expert who said he was a moderate risk. I'm going to come back, if I may, again to the unanimity question. Only because even here in front of this court, the government seems to adopt a position that if the jurors were convinced that during this two-year window of time, they don't have to be in agreement as to when, but if at some point each juror felt during that two-year window of time the offenses were committed, that that's sufficient to satisfy the Constitution as well as these statutes. And I respectfully submit that it isn't. Particularly where here, these facts are so complex with regard to varying degrees of interest, frustration, anger, whatever you will have that transpired in those two years between Mr. Denton and his therapist. On a record like this, where Mr. Denton goes in to what he thinks is going to be a counseling session and instead is ambushed, if you will, by a civil settlement session, where his own psychotherapist says, yes, he's very volatile today. No, he's not perpetrating or making threats at this point. And so on and so forth. I don't think that the analysis that the government is offering this Court is constitutional. And I understand the Court has a concern about whether or not the issue is preserved on the record below. And I can't envision any reason why defense counsel strategically would have foregone requesting a specific unanimity instruction. I don't know what anybody's thinking was, but I can see no benefit from Mr. Denton's counsel, or from Mr. Denton himself, rather, from foregoing such a request. But I submit to the Court respectfully that even if it looks at this issue under a plain error analysis, with a district court who sat as patiently and attentively as Judge Schneider did listening to this complex fact pattern for the length of time that she heard it and through the very extensive pretrial motions that she heard it, it's inconceivable to me that it wasn't apparent that this needed attention, even under a plain error standard, that this was a substantial question. The government says that the defense isn't here contending that there was some variance with the indictment. Of course he's not, because the proof that the government presented at trial was so overwhelmingly broad. How could any variance possibly be perceived? Everything from the kitchen sink and on was thrown into the trial. That's where the problem was, and I respectfully submit that that's why a specific unanimity instruction was required on these facts. And the district court's order may have been made in the arena of the duplicity argument, but it obtained straight on the point as to this specific area as well. And contrary to government counsel's view, we're not abandoning the duplicity argument. It just didn't appear to interest the Court now, but if the Court has any questions, I'd be happy to answer them. We stand on the briefing for all claims. Thank you, counsel. Thank you, Your Honor. The case just argued will be submitted. The Court will stand in recess for the day.
judges: Reinhardt, Clifton, Weiner